## 32348. PILGRIM HEALTH & LIFE INSURANCE COMPANY *v.* LEE.

DECIDED FEBRUARY 26, 1949.

    *E. E. Moore Jr., S. S. Robinson,* for plaintiff in error.
    *Louis M. Tatham,* contra.

    SUTTON, C. J. Margie Lee as beneficiary sued Pilgrim Health and Life Insurance Company in the Civil Court of Fulton County on two policies of insurance, which insured the life of her husband, Robert Lee. The petition was in two counts, the first count being on a policy for $132, and the second count being on a policy for $63, as death benefits for said Robert Lee. The policy sued on in count 1 contained the provision that, "In event the insured shall die . . as a result directly or indirectly from drinking alcoholic or intoxicating drinks . . the extent of the company's liabilities shall be the amount of the premiums paid thereon." The policy sued on in count 2 contained this provision: "No benefits will be paid to any person for . . death resulting directly or indirectly from drunkenness." The defendant pleaded as an affirmative defense these two provisions of said policies and alleged that the insured died as a result directly or indirectly from drinking alcoholic or intoxicating drinks.

    The case was tried before a jury, and a verdict was returned for the plaintiff for $195, the total amount of the two policies. The defendant moved for a new trial, the motion was overruled, and it appealed to the appellate division of said court, where the judgment overruling the motion was affirmed, and the exception here is to that judgment.

1. The case is here on the general grounds of the motion, it being contended by the plaintiff in error that the evidence demanded a verdict for the defendant. It is therefore necessary to look to the evidence. The plaintiff testified as to the death of the insured at Grady Hospital, on May 12, 1948, and that the premiums were paid on the two policies up to the date of her husband's death; that she notified the insurance company of his death; that he supported her and their five children; and that "He worked five days a week on construction work. He did not work on Saturday or Sunday. He came home the Friday before he died and he was there at the house with me on the week end. I was with him all during the week end. We went to a show Saturday night and we got up Sunday and went to church with all the children. It was Mothers' Day. He never drank whisky during the week while he was working. The only whisky he ever drank was during the week end. Sometimes during the week end he would take a few drinks, not enough to get drunk, just enough for a glow. He did hard work during the week and a drink or two during the week end would relax him. He did not drink 'alley' whisky. The only whisky he ever drank was tax-paid whisky he bought from the whisky store. He did not drink any whisky Friday night or Saturday before he died. The only whisky he drank was one or two drinks from a half pint of whisky about 4 o'clock Sunday afternoon. We were sitting on the porch Sunday afternoon when a friend of his came by and offered him a drink. His friend had a half pint of Government whisky, that is, tax-paid whisky, bought from a liquor store. The bottle had not been opened. My husband took one or two drinks. He did not drink over half of it. I would say that he drank less than one-half of the half pint of whisky. His friend drank the rest. The man's name who had the whisky is Henderson. He lives up on Bell Street. He is still living and is in good health. He never got sick. We went to bed about 10 o'clock Sunday night. My husband got up at 6 o'clock the next morning, that is, Monday morning, and made a fire in the stove. I got up and started to fix his breakfast. After I got up he started complaining about being sick. I called his boss on the phone, and we went back to bed and stayed until about 9:30. After we got up he

still kept complaining about being sick at his stomach and he seemed to get worse. About 12 o'clock Monday I took him to Grady Hospital Emergency Clinic. They kept him there about an hour and we came back home. They told me to bring him back the next day for a check-up, but during the afternoon he seemed to be getting worse and kept complaining of pains in his stomach. About 6 o'clock Monday evening I took him back to Grady Hospital. This time they kept him in the hospital and were going to operate on him for appendicitis. They took him into the operating room about 12 o'clock Monday night and kept him there for about an hour and then brought him back. They did not operate on him and didn't seem to know what was wrong with him. He kept getting worse and died at Grady Hospital Wednesday morning. . . The insurance agent brought me this proof of death certificate which the lawyer for the insurance company just handed me and told me to sign it and they would pay me the money on my policies. It was already filled out. I did not read it. He told me it was just a thing that had to be signed before I could collect my money." The two insurance policies were introduced in evidence.

The defendant introduced in evidence the proof of death certificate, signed by the plaintiff, and which, among other things, contained the following question and answer: "17. What was the cause of death? Alcoholism."

A certified copy of the death certificate of the insured, on file with the Georgia Public Health Department, was introduced in evidence by the defendant, which contained this statement on line 24: "Primary cause of death—acute alcoholism. Contributory causes—symptoms of methyl alcohol unintentional ingestion."

Dr. Gibson, a duly licensed physican, as a witness for the plaintiff, testified: "I am now practicing medicine at Grady Hospital in Atlanta. I remember treating Robert Lee at Grady Hospital this past summer. I did not see him when he first entered the hospital. I saw him first on Tuesday. I believe he was admitted to the hospital on Monday. We were in doubt as to what was wrong with him. We first thought he had appendicitis, but after he was taken to the operating room we decided that it was not appendicitis and did not operate on him. We did all we

could for him, but he kept getting worse and died Wednesday morning. In my opinion the drinking of one-half of a half pint of whisky on Sunday afternoon could not have caused his death. The active ingredient of whisky is ethyl alcohol, commonly known as grain alcohol. Ethyl alcohol is not a poison but is a so-called intoxicant. If a person should drink a pint of whisky over a short period of time it might cause his death, but the drinking of even a large quantity of whisky over a period of an hour or so would not cause death, but would only intoxicate the person. On the other hand, methyl alcohol is a poison, and the drinking of any considerable quantity of methyl alcohol, which is commonly known as wood alcohol, will cause death by poisoning. Whisky does not contain methyl alcohol. There are very strict regulations against it. Based upon our clinical observations it is my opinion that Robert Lee might have been poisoned as a result of drinking methyl alcohol. We were not sure as to what caused his death. That is the reason we asked that an autopsy be made. Methyl alcohol poisoning is only a supposition on my part. I believe it to be the most likely diagnosis. I don't believe the drinking of one-half of a half pint of methyl alcohol on Sunday afternoon could have caused his death. The drinking of that small a quantity would have probably produced blindness, but not death. I am positive that his death was not due from drinking whisky, and I mean by that ethyl alcohol. We really didn't know what caused Robert Lee's death. In our opinion the most probable cause was methyl alcohol poisoning, but any one of a dozen different things might have produced the clinical symptoms which we observed in the patient. Whisky does not contain methyl alcohol. Methyl alcohol is a poison, and the Federal Government has strict regulations against its use. Whisky contains ethyl alcohol, which is known as grain alcohol, and is not a poison, or at least is not considered a poison but an intoxicant. I can not say exactly what amount of methyl alcohol a person would have to consume to cause his death. I do not think a small amount consumed by a person would in itself cause death."

Dr. T. H. Williams, a witness for the plaintiff, testified: "I am a practicing physician. I am now working at Grady Hospi-

tal. I attended Emory University School of Medicine, from which I was graduated, and took post-graduate work at Purdue University School of Medicine. I passed the Georgia State Medical Examination and am a duly licensed physician in this State. At the request of Dr. Gibson I performed an autopsy on Robert Lee. As a result of the autopsy I found that Robert Lee died of cerebral edema and congestion, fatty metamorphosis of liver, aspiration pneumonia, vegetative lesion on root of aorta and infraction of right kidney. Any one of these things could not have caused his death, but in my opinion, his death was due to a combination of the before-mentioned findings. His condition could have been caused by several different things. In my opinion the most likely cause of his condition was methyl-alcohol poisoning. However, I could not swear that his death was brought about by the drinking of methyl alcohol. Other things could have caused his trouble. Ethyl alcohol could not have caused his condition as we found it. Whisky contains ethyl alcohol and does not contain methyl alcohol. We took a specimen of Robert Lee's blood and sent it to Emory University to be examined. However, I never heard from the specimen. It was probably lost. Even if we did have a report on the specimen, I am sure it would show no alcohol, inasmuch as alcohol is ordinarily excreted by the human system within 24 hours."

The insurance company in its answer alleged that the insured died as a result directly or indirectly from drinking alcoholic or intoxicating drinks. It now contends in its brief that the evidence demanded a finding that the insured died as a result indirectly or directly from drinking methyl alcohol, that is, wood alcohol.

The only evidence introduced by the defendant was the two certificates above referred to. The uncontroverted testimony of the plaintiff shows that the agent of the insurance company brought the proof of death certificate to her, already filled out, and told her to sign it and they would pay her the money on the two policies, and she signed it without reading it, as he told her it was just a thing that had to be signed before she could collect her money on the policies. She testified that she was with her husband, the insured, during the entire week end before his death, from the time he came home on Friday afternoon, that he did not

718

drink any whisky during that time until about 4 o'clock on Sunday afternoon, when he took a drink or two of Government whisky out of a half-pint bottle with a friend who brought it by their home, and his friend drank the rest of the half pint of whisky, and that was all the insured drank. Her husband first complained of being sick on Monday morning, about 6 o'clock, after he got up, and he went back to bed, and she took him to Grady Hospital about 12 o'clock that day. This was the only evidence as to the defendant drinking any whisky or intoxicants during the week end before his death. The testimony of the two physicians who examined and treated the insured at the hospital shows that they did not know and never did determine what was wrong with him. They said, in their opinion, his death was not caused by his drinking one-half of a half a pint of whisky on Sunday afternoon. They testified that his condition and death could have been caused by several different things—that it could have been caused by methyl or wood alcohol poisoning—but they said they could not swear that his death was the result of drinking methyl or wood alcohol.

All of the evidence is set out above, and we are of the opinion, and so hold, that a verdict for the defendant was not demanded, but that the verdict for the plaintiff was authorized by the evidence.

2. The Appellate Division of the Civil Court of Fulton County did not err in affirming the judgment of the trial judge overruling the defendant's motion for a new trial.

. *Judgment affirmed. Parker, J., concurs. Felton, J., concurs specially.*

FELTON, J., concurring specially. Construing the policies against the insurance company, I concur in the judgment for the reason that the provision in one policy, "from drinking alcoholic or intoxicating drinks," does not contemplate wood alcohol but includes merely an intoxicating beverage containing grain alalcohol; and because the provision in the other policy "from drunkenness" does not include the effects of wood alcohol.